Filed 10/30/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B250572 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA 123801) |
| v. | |
| DONALD RAY DOKINS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Pat Connolly, Judge.  Judgment of conviction affirmed; sentence reversed and remanded for resentencing.

Winston Kevin McKesson for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews, Yun K. Lee and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

_____

**SUMMARY**

A jury convicted defendant Donald Ray Dokins of the first degree murder of Angel Cortez and the attempted murder of M.C., Angel's father. Defendant was 15 years old at the time of the crimes. One of his victims, Angel, was a baby of 14 months. The jury found true three firearm allegations, as well as allegations that the crimes were committed for the benefit of a criminal street gang. Defendant was sentenced to a total term of 90 years to life in prison.

On appeal, defendant contends the evidence was insufficient; identification procedures violated his due process rights; the jury was biased; the judge was biased; there were errors in the admission and exclusion of evidence; and his sentence violated the Eighth Amendment's prohibition on cruel and unusual punishment.

We affirm the judgment of conviction, but conclude the trial court failed to consider the factors identified in *Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455] (*Miller*) before imposing on the juvenile defendant a sentence that is the functional equivalent of life without parole. We therefore reverse the sentence and remand for a new sentencing hearing.

**FACTS**

**1.      The Circumstances of the Crimes**

In the early evening of June 4, 2012, M.C. and L.N. were outside their home in Los Angeles with their 14-month-old baby, socializing with friends. M.C. was holding Angel. Others present included John B., D.R. and Javier B. (D.R.'s son). John B. was the only African-American there. It was around sunset, still light out.

Louis R., a friend of M.C.'s, arrived bringing purple shirts with a Honda symbol on them, giving them to anyone who wanted one. John B. and M.C. both took shirts and put them on.

John B. saw a person he later identified as defendant pass by the house, riding a bicycle, wearing "[a] gray sweater, hoody pullover." The hood was off. John B. made eye contact with defendant and nodded to him. John B. thought defendant was going to say something to him, because defendant stopped briefly, but defendant said nothing,

2

merely staring in John B.'s direction for about 20 seconds. Defendant then left, riding his bike to the corner, and turned right, out of sight. John B. thought nothing of it, but about two minutes later, he saw defendant a second time, riding in the same direction as he had done before.

This time, defendant stopped in front of the house. His feet were on the ground and the bike was between his legs. His hood was still down. He struggled to pull a gun out from his hoody pocket (a pouch pocket in the front with two open sides) with his left hand. He pulled out a revolver and started shooting, with his left hand. When John B. saw the gun, he told everybody to "[g]et down, get down." John B. and M.C. were still wearing their purple shirts. When the shooting stopped, John B. looked and saw defendant riding his bike, fast, toward 107th Street, where he turned left.

John B. turned to his friends and saw that Angel had a wound to his left side. The wound was bleeding, and Angel "looked in pain" and "didn't look regular." John B. took off the purple shirt, left it on the street, and walked away, because "I didn't want to see him [(Angel)] like that."

During the shooting, M.C. was in shock and stayed where he was, with Angel in his arms. When the shooting stopped, he looked at Angel, saw he had been hit, and gave him to D.R. Angel "wasn't crying anymore," and his eyes were still open. M.C. felt a cold sensation and realized he had been shot. D.R. took the baby from M.C., and then noticed the baby had been shot. The baby was trying to cry but could not, and was turning pale. She could see inside his stomach. Another woman came and did CPR on the baby, and the baby was breathing again. Then she gave the baby to the paramedics.

When the shooting started, L.N., Angel's mother, threw herself to the ground. When it stopped, she got up and looked around. She was "just in shock." She saw M.C. giving the baby to D.R. and heard him crying. D.R. called to her, and L.N. saw blood on D.R. and then realized it was Angel's blood. L.N. called the police, and then went to the hospital in an ambulance with Angel. Hours later, she was told Angel was dead. He died of two gunshot wounds, both of which were fatal.

3

Officer Ramon Borunda was the first police officer to arrive at the crime scene. He responded to a call he received at 7:51 p.m., and arrived a minute later at 7:52 p.m. It was daylight with a "slight overcast." The street lamps were not on yet. Officer Borunda walked the entire crime scene, looking for evidence. He found no bullet casings. Unlike semi-automatic weapons, a revolver does not automatically eject the casings as it is fired. Detective Scott Teubert recovered a spent projectile (or bullet) from the scene and found bullet impacts on a vehicle parked in the driveway and on a canvas canopy.

## 2. The Eyewitness Identification Evidence

Detective Roberto Bourbois and Detective Mario Aguilar were the lead homicide investigators on the case. After the shooting, they received information that led them to discover defendant's name. A detective from the gang impact team provided them with a photograph he had taken of defendant. The photograph had a dark black background, so they arranged to have the background altered to look like other booking photographs.

Detective Bourbois asked Detective Charles Hicks, who was not involved in the investigation, to create a photographic lineup, or "six-pack." (Ordinarily the investigating detectives create the six-packs, but in this instance Detective Bourbois and his partner had just obtained information about other evidence and went to investigate that lead.) Detective Bourbois had spoken to two or three witnesses at the scene, and to two other detectives who had spoken to three witnesses at the hospital, before he asked Detective Hicks to create the six-pack containing defendant's photograph. Detective Hicks "knew just the elementary stuff that everybody else knew at that time"; Detective Bourbois did not give him information "from each witness in terms of the descriptions they had given."

In the six-pack Detective Hicks created, number 1 was dark-skinned with short hair; number 2 was dark-skinned with long hair; number 3 had medium skin with long hair; number 4 had lighter skin with long hair; number 5 (defendant) had lighter skin with short hair; and number 6 had lighter skin with short hair.

The police interviewed several witnesses to the shooting and its aftermath.

4

### a. John B.

About five days after the crimes, the police came to talk to John B., who later testified to the facts described above about the shooting. John B. did not want to be involved, and was afraid. The police showed him the six-pack, and John B. identified defendant (number 5), but said he was not sure. John B. looked at the photos and said, "Number Five," and "Looks something like that. I'm not sure if it was him, but – [¶] . . . [¶] . . . Looked like that."

John B. testified at trial that he placed his initials on the six-pack "[b]ecause it looked like him"; "[i]t looked like the person that shot." (An audio recording of this interview with John B. was played for the jury.) At trial, John B. testified that he identified defendant at the preliminary hearing, and at that hearing, he did not say "it looks like him," but rather said, "That's him."

John B. agreed that seeing a photograph was much different from "seeing someone live and in person," and testified that he identified defendant at the preliminary hearing "[b]ecause I knew it was him," and "[b]ecause I remember his face." He was sure at the preliminary hearing "[b]ecause I recognized him from when he stopped the first time," and it was easier to recognize defendant when he saw him in person. He again identified defendant at trial. (Defense counsel elicited that, at the time of the preliminary hearing, John B. knew that defendant had been arrested and there was a $100,000 reward for information leading to the arrest and conviction of the killer. But no one ever told John B. that he was going to get any kind of reward, and he did not know whether someone had already received the reward.) When he testified at trial, John B. was 19 years old and in custody after convictions for grand theft, theft of an automobile, and evading a police officer in a stolen vehicle.

### b. M.C.

Angel's father is from Mexico. After Angel's murder, he suffered from panic attacks, and there were parts of the evening he had difficulty remembering. He took the purple shirt from his friend Louis because he had a Honda and liked the shirt. He put it on over the shirt he was wearing.

M.C. did not notice the person on the bicycle until he started shooting. The shooter was about 12 or 13 feet away and wearing a gray sweatshirt with a hood. M.C. did not remember anything more about the sweatshirt or the gun. He said the shooter looked between 15 and 17 years old, and estimated his height and weight as around 175 pounds and five feet eight inches. M.C. said the shooter was standing on the ground and the bicycle was down on the ground. The sun was about to go down, but there was still light and M.C. did not need street lamps to see.

After the shooting, M.C. talked to the police about the color of the assailant's sweatshirt. M.C. showed police a part of his sock that was almost the same color, and later the police showed him a photograph of an item. M.C. confirmed that the color of the item was like the shooter's sweatshirt. M.C. did not remember telling a detective that the shooter was wearing a pair of blue shorts.

### c. L.N.

Angel's mother also saw the shooter that evening. It was still very light. Around 7:50 p.m., L.N. saw defendant approaching on a bicycle. He was wearing a hooded pullover sweatshirt and "seemed friendly at first." She remembered she "had the time to think. I look at him and say, oh, probably he's here to look for somebody, because he was looking around. And I was going to approach him and ask him, are you looking for somebody." He looked "[n]o older than 23." He was about 15 feet away. The hood of his sweatshirt was up. Then he pulled out a gun and started shooting. When the shots stopped, L.N. saw defendant riding down the street toward 107th Street.

On the day of the murder, L.N. described the shooter as wearing a white shirt and a black sweater; then she told the detective it was "just a dark sweater," because she was not sure if it was black, and "just knew it was dark." (At trial, she said that the color M.C. identified as the color of the sweatshirt was "nowhere near what [she] saw the shooter wearing on the day of the incident . . . .")

Two days after the murder, police showed L.N. the six-pack containing defendant's photograph at position number 5. At trial, she testified that number 5 "stood out" to her, "right away," within seconds. The transcript of her interview with the police

6

(audio was played for the jury) showed that number 6 also stood out, and she told the officers that "[n]umber five and number six look familiar. I would say – I would say number five." She did not think she had seen any of the other four. She said, "I think I would go with number five," and "I don't know why I'm saying this, but I really don't remember the face." She said that "the eyes look familiar," "[t]he forehead kind of," and "I remember I seen short hair." She said that "something about the eyes and eyelashes" look like the killer's. After saying that "[b]oth of them look familiar," she settled on number 5 as "looking like the guy."

At trial, L.N. identified defendant as the person on the bicycle. She confirmed that, at the photographic identification, she said that "everything's a blur" and "I don't remember the face," but testified that she did not still feel that way. She testified that, when she saw defendant in person for the first time, at the preliminary hearing, she recognized him as the shooter, and said, "He looks like the one, like the person I seen that day." (At the preliminary hearing, defense counsel pointed out L.N. paused for about two minutes before identifying defendant. She said: "I need a moment. I'm trying to remember that day, remember his face, and try to see if I can be sure of my answer.") At trial, she said, "I'm saying he is the shooter because I seen him that day and it's him." She said, "I remember his eyelashes, his eyes, hair, forehead. I seen his face, I remember."

### d. Javier B.

Javier B. was present at the gathering on the evening of the murder. He was sitting in the back of a car in the driveway, watching his uncle fix the car. He saw the shooter for a few seconds, and remembered he was wearing a gray hoody, with the hood up. He could not tell if the hair he could see was long or short. The shooter looked under 20 years old. He was on a bike, and the gun looked like a revolver. He was a light-skinned African-American.

About a week after the shooting, the police showed Javier B. the photographic array, and he said that number 5 and number 6 looked familiar. At trial, Javier B. did not

7

recognize defendant as the person on the bike. He did not remember telling detectives that the shooter "looked like he was five six."

### e. D.R.

D.R. testified that when the shots stopped, she looked and saw a male with a gray hoody leaving on a bicycle. She saw him "sideways . . . so I didn't get to see his face." He was African-American, "kind of light," "[n]ot dark, dark," and looked young. "[A]t the time, I thought 16, 17, somewhere in there." The hoody was light gray and "kind of baggy." The hood was on the entire time. "When he was leaving, from what I remember, I understood him saying, 'That's right, bitch,' or something, something bitch."

### f. I.V.

I.V. lived seven or eight houses away from the crime scene. She spoke with Detective Bourbois after the shooting. She "saw the kid coming from where the shooting occurred, coming towards where I was standing." She told Detective Bourbois that the person she saw looked young, 15 to 16; was wearing a hoody; was wearing gloves and a baseball cap; had a backpack on his back; and was riding a bicycle. He was riding toward 107th Street, and turned left there.

I.V. told Detective Bourbois that she spoke to the bicyclist before he turned left. She had heard the gunshots, and asked him what happened. He said "[t]hat a kid just got hurt." He was riding "really fast." When she spoke to him, she was not nervous or scared; she "thought he was running away from the scene because he was scared." After he turned left, another person, who was excited and out of breath, came up to I.V. and said, "Where did that kid go?" I.V. said, "What kid?" and the person said, "The kid on the bicycle." I.V. said, "Oh, he went that way," and "Why?" The person said, "He just killed a baby."

Detective Bourbois showed I.V. the six-pack, and she told him "that the kid that I saw looked a lot younger than any of them in the pictures."

I.V. failed to come to court when ordered to do so, because she did not want to get involved, and a bench warrant was issued. Detective Bourbois picked her up and brought her to court on March 13, 2013 (several days before jury selection began). At that time,

8

she told the officers that she had watched the news coverage of defendant's arrest, and that the police had the wrong man in custody.

The judge told I.V. the prosecution was not calling her as a witness, but that the defense was doing so. Five days later, she sent a text message to Detective Bourbois, saying: "Hey, Detective, looking at the family inside the courtroom – [¶] . . . [¶] – it made me realize you guys may have the right guy, based upon the two youngest people in the audience, which look a lot like the killer."

The defense called I.V. to testify at trial. On cross-examination, she said she was terrified, and when asked why, she said, "For saying the truth." She said that when she saw the picture of defendant on the news (a Facebook profile picture that was in evidence), "it didn't seem like the kid I saw that seconds after the shooting. But this is the first time I seen him in person, so I'm freaking out right now, because it does look like him." By "him" she meant the kid on the bicycle, and she was referring to defendant when she said "it looks like him." She said, "I remember his face," and said defendant was "the kid on the bike that [she] saw that day."

### g.     Other identification-related evidence

While the trial testimony was that defendant used his left hand to shoot the victims, defendant's mother testified that defendant eats, writes, shoots basketballs and throws footballs with his right hand. A photograph at age 15 showed defendant holding a water gun with his right hand. Detective Bourbois testified that he (Detective Bourbois) was right-handed, but can also shoot with his left hand, and was "trained in being able to shoot with both hands."

Detective Bourbois measured defendant's height; he was five feet three inches tall.

## 3.     The Investigation and Other Evidence

Captain Phillip Tingirides, the area commanding officer for the southeast community police station, arrived at the crime scene at about 9:40 p.m. Captain Tingirides often acts as liaison between the police and the media. At 10:00 p.m., he released information about the shooting in an interview with a reporter who was sending out a live feed, and others who were recording the interview. (A video of the interview

9

was played for the jury at the trial.)  Other developments followed in the wake of the media reports.

### a. J.J.

J.J. saw the 10:00 p.m. news that evening, reporting the baby's murder.  She was at home, and then lived next to a vacant house.  The house had been vacant for about a year, and J.J. had lived in the area for about two and a half years.  (She asked to be and was relocated before she testified at the preliminary hearing.)  Later on the evening of the shooting, around 10:30, she smelled a strong odor of gasoline and saw a "big orange glare."  She and her fiancé ran to the window and saw a fire in the driveway of the vacant house.  She was scared.  She grabbed a bucket, and "started dousing water on the fire," from a children's pool in front of her house, throwing the water through a wire fence that separated her house from the vacant house next door.  The fire kept reigniting, but eventually she and her fiancé succeeded in putting it out.

After the fire was out, J.J. went over to look at the item that had been burning.  It was a sweater, and J.J. had seen defendant wearing it once or twice.  Defendant lived in the neighborhood, about four houses down from the fire.  J.J. had seen defendant around the neighborhood "[a]round 11 or 12 times" before the night of the fire.

J.J. had heard on the news that a suspect was wearing a sweater.  She called the police "to let them know that there was a burned sweater in a vacant house next door."  The next morning, detectives came to her home and she directed them to the location of the sweater, but did not accompany them.  She was afraid of being seen talking to the police and being labeled a snitch.  She told the police about defendant wearing the sweater; she did not know his name, but gave the police the initial "D."  The police showed her a photograph of defendant, and J.J. said, "[t]hat's him.  That's the little boy from down the street."

Other officers came to photograph and then recover the burned hoody sweatshirt, which smelled like gasoline.

J.J. had been a member of the Grape Street gang, but chose to leave the gang 10 or 11 years earlier.  Her fiancé had also been a gang member, but left the gang nine to 10

10

years earlier. J.J. knew that defendant was a member of a gang named Fudge Town Mafia, because defendant "put up his gang signs" while she was driving on the street to her house; defendant was wearing the gray sweater at the time. She had another encounter with defendant in which defendant approached her about a dog, but had never had any problems with defendant.

At trial, J.J. identified a photograph of defendant wearing "a dark, a gray sweater" that she had seen him wearing before, "[l]ike an oversize sweater," and "it look[ed] like" the one she saw in the driveway that had been set on fire. Defense counsel elicited that J.J. had testified at the preliminary hearing that she saw defendant wearing the gray hoody "just one time, but I paid attention to him," and that she did not remember whether the hoody she saw him wearing "pulled over or zipped up." Her preliminary hearing testimony was: "I can't tell you that, if it was a zipper or overhead. I don't remember seeing a zipper. I wasn't paying attention for a zipper, or whatnot. I just remember seeing a dark gray hoody. I think it was a pullover." (The hoody that was burned did not have a zipper.)

J.J. also described the boy wearing the sweatshirt "as being short and having tattoos on his face," but defendant has no tattoos on his face. J.J. testified at trial that she "actually thought the defendant had tattoos on his face from the one glance I had seen him. I never really saw him." She said there was "something about his face [she] thought was a tattoo." (The prosecutor said, in her final argument, that "you can see, there's moles and little spots of discoloration on [defendant's] face.")

### b.     The DNA evidence

Criminalist King Chuk Chow swabbed the collar and cuffs of the partially burned sweatshirt that police retrieved from the driveway of the vacant house. Mr. Chow used one swab for both the collar and cuffs. He sent the swab to a laboratory for DNA analysis. He later received a sample of defendant's DNA from the police and sent that sample for testing.

A DNA analyst from the laboratory compared both samples and concluded the DNA profile from the swab of the gray sweatshirt matched the DNA profile from

11

defendant's sample. The analyst's statistical calculations showed that the probability of randomly selecting an unrelated individual with the same DNA profile was 1 in 4.7 quadrillion in the African-American population.

### c. The gang evidence

Detective Aguilar believed the crimes may have involved a gang known as the Fudge Town Mafia Crips. He knew the gang had its own Facebook page, and a few days after the crimes he conducted a random search of the gang's page. One of the gang's "friends" was "an individual that had the moniker of Infant Da Loc, and that picture closely resembled [defendant]." "Loc" is associated "with being a Crip." In the photograph, Infant Da Loc was "wearing a backwards baseball cap, a brown one, which is associated with their colors, and it's turned backwards, and there's writing of 'Ridaz,' and from my knowledge, the T-Funk Ridaz were a clique within Fudgetown Mafia." (In parentheses next to "Infant Da Loc" were the words "Infant TFR," and "TFR is for T-Funk Ridaz.")

Detective Aguilar gave the Facebook information to Officer Owen Berger, who was assigned to the Cyber Support Unit and had expertise and training in social media and computer investigations. Officer Berger wrote a search warrant and served it on June 13, 2012. Facebook provided an encrypted disk with 1,107 pages of information. The names "Donald" and "Dokins" appeared about 100 times, and a phone number appeared between 45 and 50 times. There were about 40 images of defendant. Officer Berger opined that the Facebook page belonged to defendant.

One of the pages contained name changes for the account. On October 26, 2011, the user changed the name on the account from Donald Dokins to "TFR CSM," and on February 23, 2012, changed the name to the current name, Infant Da Loc.

The Facebook information contained many photographs, with identifying data as well as tags and comments showing who uploaded the photograph and when. One image of defendant showed it was uploaded on December 11, 2011, and showed a comment about the photo posted by "Janky TFR Stixx" on December 13, 2011, saying "Yuh TFR now." (This means, "You T-Funk Rider now," or "Are you TFR now.") Not long after

12

that comment, Infant Da Loc posted a comment saying, "Yup JK wattz up JK with u were u been." There were others, including an image of defendant in the gray sweatshirt, uploaded on November 23, 2011.

There were also many text messages. Usually the account holder posts the "status" and comments are made about the post or status. On February 6, 2012, the status posted was: "If you aint a killa stop putting K'z after yo letters." Infant Da Loc posted a text message the same day saying, "On Ridaz." Another, posted December 13, 2011, said "2 thingkz I hate the most Mexicanz and police." Infant Da Loc posted a text message that said, "Txt me, 213-280-9997," on February 8, 2012. That was the telephone number occurring repeatedly throughout the account.

The police executed search warrants for two locations defendant considered home. One was his mother's house at 1929 East Santa Ana North, about a block and a half from the crime scene. The other was 1820 East 109th Street, defendant's grandmother's house.

During execution of the warrant at 1929 East Santa Ana Boulevard on June 27, 2012, police found a cell phone. The word "infant" was scribbled into the plastic on the back cover. Police recovered a shoebox with a drawing of grapes with an "X" through it. The drawing was a sign of disrespect to the Grape Street Crips gang. Police also recovered a backpack that "contained notebook pads with the name of Donald on it, Donald Dokins on it." Police searched a computer with a log-in that was either a photo of defendant or his first name, Donald. Officer Nicholas Cho searched the "My Pictures" folder. He was looking for photos of defendant wearing a hooded sweatshirt or throwing gang signs or the like. He found several pictures of defendant in a hooded sweatshirt. In some, defendant was throwing gang signs. One had a marlin in the background and contained a large "F" with "Fudgetown" along the bottom of the photo.

Detective Nathan Kouri participated in the search of 1820 East 109th Street. He found a backpack with two spiral notepads, one red and one yellow. The yellow notebook contained the written name, Donald Dokins. Detective Kouri also searched the garage, and saw a large plastic gas can. There was "some layer of dust kind of on there,

13

situated on the top, and in certain areas . . . ." Detective Kouri did not recover the gas can, but had it photographed. The photographs showed that the area "where the handle is located, where one would pick up the gas can, and the area right below it, those did not have a layer of dust." The spout area "also seems to be broken up from having a full layer of dust." Detective Kouri formed the opinion that, "because of all the other dust around the can, that it probably wouldn't be the best surface to recover latent prints from . . . ."

When defendant was arrested, there was a marking on his left arm (not a tattoo), "almost like an etching or a branding," that said "TFR," signifying T-Funk Ridaz. By the time trial proceedings began, the "TFR" was still there, but very faintly.

Detective Patrick Flaherty was a member of a gang unit assigned to the area that included defendant's neighborhood. He had specialized in the Fudge Town Mafia Crips since 1997. Members of that gang were known to frequent a house at 1814 East 109th Street. Detective Flaherty identified defendant at the trial, and testified he had encountered defendant on three separate occasions, on each of which he or his partner prepared a field identification card. One of these occasions was October 19, 2011. The address noted on the field identification card was 1814 East 109th Street, and the card indicated that defendant admitted to being a Fudge Town gang member. The card also indicated defendant was in the company of another gang member at the time. A second field identification card for defendant on October 25, 2011, contained the moniker of "Infant Stebo" (information defendant gave to the detective) and indicated defendant admitted being a Fudge Town gang member. The third field identification card was dated June 5, 2012, a day after the murder, and the contact occurred at 1820 East 109th Street. The card also contained defendant's cell number, 213-280-9997, documented a mark of the letters "TFR" on defendant's left forearm, and indicated defendant said he had been a Fudge Town member for one year.

Detective Samuel Marullo, a homicide investigator assigned to the criminal gang homicide division, testified as a gang expert. He testified about how individuals join gangs, "putting in work" for the gang, levels of status and roles within the gang, gang

14

monikers, gang rivalries, the ramifications of "snitching," the role of guns and sharing and disposing of guns in gang culture, and so on. He described the Fudge Town Mafia Crips and its smaller clique, T-Fund Ridaz, including the gang's territory, clothing, color (brown), graffiti symbols, hand signs and tattoos (including "TFR").

The T-Funk Ridaz clique was small, with roughly 12 to 15 members. Detective Marullo had had personal contact with most of the clique members, and knew of defendant but had never seen him. Defendant was the only member of his age in the clique in June 2012.

The T-Funk Ridaz clique "is a clique of shooters, riders." "Ridaz" means riders, and "it means in the gang context shooters. They're riders. They're the shooters in the gang . . . . [T]here is a small percentage of gang members who are shooters."

Detective Marullo testified that Fudge Town was in a feud or war with rival gang Varrio Grape Street, whose color is purple, and the crime scene was within the territory in dispute. Detective Marullo explained the genesis of the war. In the past, the two gangs had shared the same territory. In February 2008, a Fudge Town member named "Limp" was killed by a gang member from Watts Varrio Grape, a predominantly Hispanic version of Grape Street. That caused tension but not a war until March 2011, when a Fudge Town member named Stebo was stabbed by a Watts Varrio Grape member, after which there were multiple shootings and murders between the two gangs. The war was ongoing, with at least 30 shootings and seven murders (including three civilians mistaken for gang members) between March 2011 and the time of defendant's trial.

During the war, on May 31, 2012, there was a preliminary hearing at which three "very well-loved Fudge Town Mafia Crip gang members," all members of the T-Funk Ridaz clique, were held to answer for several crimes, including the attempted murder of a police officer and (as to two of them) the murder of a Watts Varrio Grape gang member. Fudge Town gang members were angry about that, and "they believed that the police were working with the quote, unquote, Mexicans. And they had a lot of disdain for the police as well as for the Mexican community members."

15

Detective Marullo testified that the primary activities of the Fudge Town Mafia gang were murder, attempted murder, sales of narcotics, robbery (especially home invasion robberies) and other crimes. He also testified to predicate offenses committed by Fudge Town Mafia members establishing a pattern of gang activity.

As to defendant, Detective Marullo opined that defendant's admitted moniker, "Infant Stebo," was inherited from admitted Fudge Town gang member Steveny Patterson, known as "Stebo." Detective Marullo testified to the gang significance of various photographs of defendant displaying gang signs and wearing the gang color, brown. Detective Marullo also testified to the gang significance of various text messages on defendant's Facebook page, explaining that "[e]very time there is a G [(which signifies Grape)], there has got to be a K [(signifying killer)] next to it – [¶] . . . [¶] – to send the message that as a Fudge Town gangster you're a Grape killer." The detective reviewed numerous messages, and testified they showed, for example, "a knowledge of the gang politics and the goings on within the gang," and that defendant was "basically holding himself out to be a Grape Street killer . . . ." In addition, Detective Marullo reviewed defendant's notebooks, and testified to the gang significance of the writings appearing in them. (Eventually, the court "impose[d] its own cumulative objection, even though the defense has not objected at all.")

Detective Marullo concluded that defendant was a gang member, and opined that defendant "was an up and comer, still is an up and comer." When given a hypothetical based on the facts of this case, Detective Marullo opined that the crimes were committed for the benefit of a criminal street gang. He testified to the many benefits for the gang, including eliminating an enemy, inspiring fear in the community and the rival gang, and inspiring other gang members.

### d.    Other evidence

In addition to testifying that defendant was right-handed, defendant's mother testified that her nephew, Terry Maiden, also lived at defendant's grandmother's house, and that Terry Maiden has tattoos on his face; he was on probation in June 2012. Defendant's mother identified her son in several photographs, but she said one of them

was "blurry" and she did not recognize her son in that picture. She also recognized a photograph of Terry Maiden, dated April 12, 2012, and could see no tattoos on his face. Terry Maiden was 33 or 34 years old.

## 4. The Verdict, New Trial Motion and Sentencing

The jury convicted defendant of both counts and found the firearm and gang allegations true.

The day before defendant's sentencing, counsel filed a motion for a new trial based on insufficiency of the evidence. The trial court denied the motion, stating that it was an "extremely sad case," but that the evidence was "absolutely overwhelming."

The court sentenced defendant to a total of 90 years to life in prison, and ordered custody credit for 360 days of actual custody.[1]

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant raises several claims of error.

## 1. Sufficiency of the Evidence

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are

---

[1] The abstract of judgment is not in the clerk's transcript, which was filed on September 27, 2013. As of August 2, 2013, defendant had not been committed to state prison. The court indicated that defendant was going to school and was expected to graduate in three months, and "we're going to bring you back November 18. [¶] [T]he issue with that is, because you've already been sentenced, they wanted to send you out. . . . So we've taken care of that."

17

physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) So, " 'if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

We have recited the evidence in this case at considerable length. Under the standard of review by which we are bound, it is quite clear that substantial evidence supports the jury's verdict, and there is little else to be said.

Defendant insists the case is based on "faulty witness identification testimony." He recites the inconsistencies in the testimony, and points out there was "not one single absolute identification" by witnesses when they were presented with the photo six-pack. These claims are to no avail. L.N., John B. and I.V. identified defendant at trial, and the facts related to their viewing of the six-pack and other earlier statements were presented at trial (see pt. 2, *post*). Moreover, lack of 100 percent certainty and expressions of doubt "do not preclude the existence of sufficient support for the jury's verdict. '[I]t is not essential that a witness be free from doubt as to one's identity. He may testify that in his belief, opinion or judgment the accused is the person who perpetrated the crime, and the want of positiveness goes only to the weight of the testimony.' " (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 522; see *ibid.* [discrepancies between witnesses' observations "did not necessitate the jury's rejection of their identifications"; " '[t]he strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, the uncertainty of recollection, and the qualification of identity and lack of positiveness in testimony are matters which go to the weight of the evidence and the credibility of the witnesses, and are for the observation and consideration, and directed solely to the attention of the jury in the first instance' "].)

Defendant also challenges the DNA evidence, telling us that his DNA could have come from simply touching the sweatshirt, and there was testimony that gang members share clothes. He also complains that the criminalist swabbed two areas of the sweatshirt with one swab; the DNA analyst ran only one type of DNA analysis; and the test did not

18

show how long the DNA sample had been present on the sweatshirt. Once again, the strength of the DNA evidence was for the jury to decide. Defendant presented no evidence and cites none that casts any doubt on the reliability of the DNA testing procedures.

Finally, defendant complains there was no evidence of a motive for the crime. While no evidence of motive is required for a murder conviction, the evidence of defendant's gang affiliation and the feud between his gang and its rival, Varrio Grape Street, was overwhelming. Defendant's suggestion that the absence of any other "actual evidence" that he wanted to kill anyone raises a reasonable doubt of his guilt is simply wrong.

**2.     The Photographic Array**

Defendant challenges the photographic lineup as "impermissibly suggestive" because only two of the six photos depicted African-Americans with light skin and short hair. This, he says, skewed the initial identifications and gave rise to a very substantial likelihood of irreparable misidentification. (*Simmons v. United States* (1968) 390 U.S. 377, 384 (*Simmons*) ["convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"].) We find no error.

Defendant did not raise this claim at trial, and arguably has forfeited the claim. (See *People v. Elliott*, *supra,* 53 Cal.4th at pp. 585-586 ["Insofar as defendant is asserting that unduly suggestive pretrial identification procedures tainted the courtroom identifications, so that the witnesses should not have been permitted to identify defendant in court, defendant has forfeited the claim by failing to make a timely objection or motion to exclude in the trial court"].) But even if defendant had made a timely objection, he has failed to establish the photo array was impermissibly suggestive.

The applicable principles are clear. "Defendant bears the burden of showing unfairness as a demonstrable reality, not just speculation. [Citation.] 'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly

19

suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of [her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation]. If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable. [Citation.]' " (*People v. DeSantis* (1992) 2 Cal. 4th 1198, 1222.)

Other cases are also instructive. In general, " '[a] procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police.' " (*People v. Hunt* (1977) 19 Cal.3d 888, 894.) "However, there is no requirement that a defendant in a lineup, either in person or by photo, be surrounded by others nearly identical in appearance." (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052.) "Nor is the validity of a photographic lineup considered unconstitutional simply where one suspect's photograph is much more distinguishable from the others in the lineup." (*Ibid.*)

Here, defendant has not shown the photo array was impermissibly suggestive. Indeed, he has not placed the exhibits that were before the jury in the appellate record. And he concedes that at least one other photograph was also of a light-skinned African-American male. Certainly nothing in this procedure " 'suggest[ed] in advance . . . the identity of the person suspected by the police.' " (*People v. Hunt, supra,* 19 Cal.3d at p. 894.) Consequently, "[t]he similarity in appearance of members of a photographic lineup, and the weight to be accorded such, are matters completely within the province of the trier of fact to resolve." (*People v. Brandon, supra,* 32 Cal.App.4th at p. 1053.)

Because defendant has not established the photo array was impermissibly suggestive, we need not proceed with the second step of determining whether the identifications were nevertheless reliable under the totality of the circumstances. But plainly they were. I.V., who spoke with the perpetrator after the murder, could not identify defendant from the photo array, but identified defendant at trial. John B. and

20

L.N., who witnessed the shooting, both expressed less than total certainty when viewing the photo array, but identified defendant at trial. Their opportunity to view defendant at the time of the crime, degree of attention, accuracy of description, and level of certainty (described in detail in the facts, *ante*) were all explored at trial. Defendant has not shown any of these factors support his claim the photo array "[gave] rise to a very substantial likelihood of irreparable misidentification." (*Simmons, supra,* 390 U.S. at p. 384.)

We are bound by the law as stated by the Supreme Court, and that court has expressly rejected claims that eyewitness testimony was unreliable "because the witnesses' initial descriptions of the perpetrator were inconsistent and because the identification testimony was tainted by suggestive lineups and photo arrays . . . ." (*People v. Elliott, supra,* 53 Cal.4th at p. 585 ["Inconsistencies in [the witnesses'] initial descriptions of the perpetrator and any suggestiveness in the lineups or photo arrays they were shown are matters affecting the witnesses' credibility, which is for the jury to resolve."]; see also *In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497 ["when the circumstances surrounding the identification and its weight are explored at length at trial, where eyewitness identification is believed by the trier of fact, that determination is binding on the reviewing court."].) So it is here.

3.     **The Claim of Jury Bias and Jury Misconduct**

After the guilty verdict, defendant sought a new trial. His motion was based on the insufficiency of the evidence, and upon a declaration from his counsel about his conversations with "several jury members." From those conversations, counsel concluded that the nature of the offense in this case (the murder of a baby) and defendant's gang affiliation "prevented the jury from examining the evidence objectively."

Counsel's affidavit recounted that he questioned the jurors about the fact that defendant was right handed but the perpetrator fired with his left hand; the father could not identify the shooter and described his size and weight as different from defendant's; the mother's description of the color of the sweatshirt was different from everyone else's; the witness that discovered the burned sweatshirt said the owner had tattoos on his face;

21

and defendant had no history of violence and was not connected with the kind of bicycle the shooter was riding. The answers of the jurors, counsel averred, excused the parents' inconsistencies because their child was murdered, and focused on the defendant's gang membership and vile statements defendant wrote about Mexicans and the police. Counsel concluded the jury "spent very little time examining the evidence but they spent a great deal of time discussing the defendant's gang ties along with the fact that the victim was a small child," and the verdict was not supported by the evidence but instead "it was a byproduct of sympathy for the victim's family and hatred for the defendant's associations and beliefs."

As indicated earlier, the trial court denied the new trial motion, after discussing the evidence and concluding it was "overwhelming against [defendant]."

On appeal, defendant has converted his insufficient evidence claim to a claim of jury misconduct. He contends the jurors "had actual and implied bias" and "animosity" toward defendant, making it "impossible for jurors to rule impartially." He asserts, with no evidentiary basis except counsel's declaration, that "it is certain that some jurors formed the opinion of guilt before they had heard all the evidence." This was "jury misconduct" that violated his right to a trial by unbiased, impartial jurors.

There is no merit to this claim.

Of course, if a juror were to make a statement showing he or she had prejudged the case, that would be a statement of bias, and "a statement of bias is misconduct because bias is misconduct." (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 788, 791 [juror's statement that she had made up her mind during the trial was a statement of bias showing she had prejudged the case and thus had committed misconduct].) In such a case, "if it appears substantially likely that a juror is actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict." (*In re Carpenter* (1995) 9 Cal.4th 634, 654.) "[T]he initial burden is on defendant to prove the misconduct." (*Id.* at p. 657.)

22

Defendant has shown no misconduct. All we have here is counsel's affidavit, recounting his impressions of what several jurors were thinking when they rejected or discounted the inconsistencies in specific items of evidence counsel cited to them (which did not include the significant items of evidence that supported the verdict). For example, counsel says he pointed out to the several jurors with whom he spoke "that the defendant was never associated with the type of bike described at the trial," and "[t]he response once again was, 'he is a gang member and did you listen to those vile things he wrote.'"

There is nothing in counsel's declaration that in any way supports defendant's assertion that the jurors "formed the opinion of guilt before they had heard all the evidence." And to the extent counsel's declaration accurately reported what the jurors said to him, those responses concern their mental processes and may not be used to challenge the verdict. (*People v. Steele* (2002) 27 Cal.4th 1230, 1261 [" ' "[A] verdict may not be impeached by inquiry into the juror's mental or subjective reasoning processes" ' "; " '[t]he only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict . . . are those open to sight, hearing, and the other senses and thus subject to corroboration.' "].) Defendant has produced no evidence whatsoever of jury bias or misconduct.

### 4. The Claim of Judicial Misconduct

"A criminal defendant has due process rightsunder both the state and federal Constitutions to be tried by an impartial judge." (*People v. Cowan* (2010) 50 Cal.4th 401, 455.)

Defendant contends that, "[f]rom the beginning of this case," the trial court "showed bias, prejudice, and partial[ity] against [defendant] . . . ." Defendant cites evidentiary rulings (including rulings he does not challenge on appeal); the court's decision to allow the media in the courtroom during the sentencing hearing, in "disregard for [defendant's] safety"; the court's comment at sentencing, after denying a new trial, that "this case was absolutely overwhelming as to the cowardly act that [defendant] committed"; and the court's other stern comments to defendant during the sentencing

23

hearing (for example, expressing hope that defendant could be redeemed, but stating "I'm not willing to bet on it," and saying that defendant "has made his bed and he will now lie in it").  Defendant's claim is unfounded.

First, defendant made no claim of judicial bias or misconduct at trial, and so has forfeited the claim on appeal.  (E.g., *People v. Rodriguez* (2014) 58 Cal.4th 587, 626 ["Defendant may not go to trial before a judge and gamble on a favorable result, and then assert for the first time on appeal that the judge was biased."].)

Second, the contention in any event lacks merit.  " '[A] trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review.  [Citations.]' " (*People v. Pearson* (2013) 56 Cal.4th 393, 447.)  Nor do the court's comments concerning the new trial motion and at the sentencing hearing reflect judicial bias.  The court made the challenged comments after defendant stood convicted of offenses properly described as "heinous."

Nothing in the court's comments evinced bias against defendant.  Indeed, although the court indicated that defendant had "hatred in [his] heart" that the court could not understand, and the court was "not willing to bet on" defendant's redemption, the court expressed its hope for defendant:  "You are not capable of showing remorse today, maybe not tomorrow, but I hope someday you are able to.  [¶]  I've heard from your teacher, who speaks very highly of you. . . .  And it is my hope that she is right, that you can be redeemed."

Similarly, the court's order permitting media to attend the sentencing hearing, over defense counsel's objection on prisoner safety grounds, does not demonstrate judicial bias.  Notably, the court refused requests by news media to bring cameras into the courtroom for closing arguments, indicating it would reconsider the requests "if there is a verdict in this case . . . ."  This demonstrates the court's concern for defendant's due process right to a fair trial, not bias against defendant.

In addition, the record shows the trial court's postsentencing efforts to assist defendant in completing his school graduation requirements before being transferred to state prison (and its denial of media requests for cameras during that hearing).  These are

24

not the actions of a biased judge. Indeed, defense counsel began his argument against cameras at the sentencing hearing by saying, "I do want to commend the court on the way it conducted all of these proceedings, including the trial." And earlier, during the trial, after an adverse evidentiary ruling, defense counsel said, while disagreeing "in the strongest terms" with the court's ruling, that the court "has conducted a very, very fair trial."

In short, defendant's judicial bias claim is baseless.

## 5. Evidentiary Rulings

Defendant makes several claims of error in evidentiary rulings. None has merit.

### a. The gang expert's opinion

Detective Marullo, the prosecutor's gang expert, opined that defendant was a member of the Fudge Town Mafia Crips and the T-Funk Ridaz clique, and that defendant "was an up and comer, still is an up and comer." He also opined about the benefits of the crime for the gang, including inspiring other gang members: "It also increases the status of that shooter within the gang . . . . It raises the bar, meaning it sets an example. This is an up and comer. This is a person who's devoted to the gang, that doesn't care about anything else, that's going to go and do a shooting in broad daylight with people everywhere. That raises the bar. That inspires other gang members."

Defendant complains that Detective Marullo's opinion about defendant's gang membership and status as an "up and comer" was based on inadmissible hearsay, that is, on a conversation the detective had with a suspect in another investigation, to the effect that defendant "was putting in work for the gang." (We note the court did *not* permit the use of any "of the specifics of this statement," saying it was "far too prejudicial to allow.")[2]

---

[2] The court stated its assumption that the gang expert would "characterize the defendant as a young up-and-comer," and cautioned defense counsel "not to open the door" (about the basis for that characterization) because "then we have a much different situation." Defense counsel clarified (and the trial court confirmed) "that it's the People's obligation to advise [the gang expert] that he is to say no more than that, . . .

There was no error in allowing the gang expert to opine on defendant's gang membership and his status in the gang. First, contrary to defendant's assertion, the expert did not rely on the conversation in question for his opinion about defendant's gang membership; that was based on defendant's Facebook pages, drawings in defendant's notebooks, a marking on his arm, and his admission to other officers. Second, it is settled that an expert witness may base an opinion on matters that would otherwise be inadmissible under the hearsay rule. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9 ["because the culture and habits of gangs are matters which are 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact' [citation], opinion testimony from a gang expert . . . is proper"; "[s]uch an expert—like other experts—may give opinion testimony that is based upon hearsay, including conversations with gang members"].)

Defendant does not address or acknowledge this authority. It is controlling, and accordingly we need not discuss the point further. There was no error.

b. **Evidentiary exclusions**

Defendant contends that several rulings excluding defense evidence violated his due process right to present evidence casting doubt on his guilt. We see no error in these rulings.

The rules of law are well settled. The accused has a due process right "to present all relevant evidence of *significant* probative value to his defense." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.) "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834.) "The trial court has broad discretion in determining the relevance of evidence," and we review its rulings on the admissibility of evidence for abuse of discretion. (*People v. Harris* (2005) 37 Cal.4th 310, 337; *People v. Hall, supra,* 41 Cal.3d at p. 834 ["Courts retain . . . a traditional and intrinsic power to exercise

_____

because if he volunteers in response to a direct question, I'm going to be asking for a mistrial."

discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice."].)

Defendant first complains because the court would not allow defendant to be measured in front of the jury, so the defense could show his height was very different from the height in M.C.'s description (five feet eight inches). Instead, Detective Bourbois testified that he measured defendant at counsel's request, and defendant was five feet three inches tall. We can fathom no basis for a claim of error.

Defendant next complains because the court excluded evidence proffered for the purpose of showing defendant was right-handed (while the shooter used his left hand).

First, the court refused to admit photographs of defendant when he was one year old, and a photograph of defendant with his football team. (The court admitted in evidence a photograph of defendant as a teenager holding a water gun in his right hand.) The court observed that it "sees no relevance, whatsoever . . . as to the photographs from him being one year old, literally in diapers," and the only one arguably showing right-handedness showed his mother guiding his right hand to cut a cake. The football photo was not an action photograph, but a team photo; "just because [the ball] is being held by two kids who have their hands on that same ball, does not make [defendant] right handed, nor does it make the young gentleman who is holding the ball with [defendant] left handed." We see no abuse of discretion in this ruling.

Second, the court refused to allow defendant to demonstrate his right-handedness by writing his name with his left hand and then with his right hand, in front of the jury, unless defendant testified. The court observed that "[t]here is going to be testimony as to his writing from his mother. And the court is not saying that you can't call other individuals who have seen him write, but he is not going to be writing in front of this jury." Defendant offers no authority suggesting this ruling was an abuse of discretion, and we conclude it was not. We agree with respondent that such a demonstration would have limited probative value, and in effect would permit defendant to testify without cross-examination. There was no error.

Third, the court refused defense counsel's request to have another attorney from his office, who was "familiar with [defendant's] handwriting" and "[had] copies of what he's written with his right and left hand," to testify that defendant is right-handed. After inquiring how many times the witness had met defendant, and being told "once," the court refused to allow the testimony. Given the apparent lack of foundation for the witness's testimony, we see no abuse of discretion.

## 6.  The Eighth Amendment

On June 21, 2013, the court sentenced defendant, who was 15 years old when he committed these crimes, to 90 years to life in prison: 25 years to life for the first degree murder of Angel Cortez (Pen. Code, § 190, subd. (a)), plus a consecutive 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), and a consecutive term of 15 years to life for the attempted murder of M.C. (§§ 187 & 664), plus a consecutive term of 25 years to life for the firearm enhancement.

On appeal, defendant contends, in substance, that a sentence of 90 years to life is the equivalent of life without parole, and violates the Eighth Amendment's prohibition on cruel and unusual punishment as construed in *Miller, supra,* 132 S.Ct. 2455 and related cases. As we explain below, under the Eighth Amendment as construed by the high court and our Supreme Court, "a sentencing court must consider the factors discussed [in *Miller*] before imposing life without parole on a juvenile homicide offender." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1389 (*Gutierrez*).) Because a minimum sentence of 90 years is indisputably the functional equivalent of life without parole, the trial court was required to consider the *Miller* factors before imposing that sentence. The record demonstrates it did not do so, and consequently we must reverse the sentence and remand the cause to the trial court for a new sentencing hearing.

### a.  Legal background

In recent years, the high court and the California Supreme Court have narrowed the punishments that are permissible for juvenile offenders under the Eighth Amendment.

In *Roper v. Simmons* (2005) 543 U.S. 551, 568 (*Roper*), the high court held the Eighth Amendment bars capital punishment for juvenile offenders.

28

In *Graham v. Florida* (2010) 560 U.S. 48, 74 (*Graham*), the high court held the Eighth Amendment bars a sentence of life without parole for juveniles who commit nonhomicide offenses.

In *Miller*, the high court held the Eighth Amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Miller, supra,* 132 S.Ct. at p. 2469.) The court explained: "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features— among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him— and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller,* at p. 2468.) So, "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." (*Miller,* at p. 2469.)

*Miller* continued: "[W]e do not consider [the] argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." (*Miller, supra,* 132 S.Ct. at p. 2469.)

In *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*), our Supreme Court held that, "[c]onsistent with the high court's holding in *Graham*," the Eighth Amendment bars sentencing a juvenile offender, for a nonhomicide offense, "to a term of

years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy."

In *Gutierrez, supra,* 58 Cal.4th 1354, the court found no constitutional infirmity in Penal Code section 190.5, construing it to give the court the discretion "to sentence a 16- or 17-year old juvenile convicted of special circumstance murder to life without parole or 25 years to life, with no presumption in favor of life without parole." (*Id.* at p. 1360.) *Gutierrez*, which was decided after the sentencing in this case, held "that *Miller* requires a trial court, in exercising its sentencing discretion, to consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender." (*Id.* at p. 1361.)

*Gutierrez* further instructed: "[A] sentencing court must consider the [*Miller*] factors . . . before imposing life without parole on a juvenile homicide offender." (*Gutierrez, supra,* 58 Cal.4th at p. 1389.) While "not every factor will necessarily be relevant in every case," *Miller* " 'require[s] [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' " (*Gutierrez,* at p. 1390.)

**b.      The sentencing in this case**

This case presents questions not decided in the jurisprudence we have just described, though similar issues are currently pending in our Supreme Court. Here, the court imposed a sentence – 90 years to life – that is the functional equivalent of life without the possibility of parole. As we have seen, *Miller* did not categorically bar that penalty, "mandat[ing] only that a sentencer follow a certain process – considering an offender's youth and attendant characteristics – before imposing a particular penalty." (*Miller, supra,* 132 S.Ct. at p. 2471.) The question, then, is the one articulated by the *Gutierrez* court in its conclusion: "The question is whether [defendant] can be deemed, at the time of sentencing, to be irreparably corrupt, beyond redemption, and thus unfit ever to reenter society, notwithstanding the 'diminished culpability and greater prospects

for reform' that ordinarily distinguish juveniles from adults." (*Gutierrez, supra,* 58 Cal.4th at p. 1391.)

The sentencing in this case proceeded as follows. Respondent filed a sentencing memorandum contending that circumstances in aggravation – a premeditated crime of great violence and cruelty, using a firearm to murder a defenseless infant, and a defendant posing a serious danger to society – called for consecutive sentencing. Respondent stated there were no circumstances in mitigation, and requested imposition of the maximum sentence of 90 years to life.

Defense counsel did not submit a sentencing memorandum.

The probation report in the record is a pre-conviction report, stating it was unknown if defendant had any alcohol or substance abuse problems, or any physical, mental or emotional health problems. Likewise the level of his education, marital and parenthood status, and financial status were unknown. As circumstances in mitigation, the report stated defendant had no prior record. The report concluded circumstances in aggravation (particularly vulnerable victims and premeditation) outweighed circumstances in mitigation and warranted imposition of the high-base term.

The sentencing hearing began with testimony from the murder victim's mother and another relative, and the reading of statements from two other relatives. Then the defense presented testimony from five witnesses.

S.C. was defendant's teacher after his arrest. She testified that during 10 years in her job, teaching hundreds of kids, she had "hardly spoken up for anyone, but I feel the need to speak up for [defendant]." She said he had been in her class for almost a year, never missed a class, and she had watched him change as a person. S.C. said: "He came into my class as a tough little guy, and has softened and changed quite a bit, everything about him, including his writing. And he's a very little, frightened boy – that's how I would describe him – wrapped in some other kind of mask. He's little in size, and little inside, and frightened, but he's very bright and has potential in this world. [¶] And I think we're all very redeemable, and I think that – I think there is wisdom in mercy. And

31

I would ask the court to show mercy. [¶] And the final thing I'd like to say is, it's extremely hard to be an angel if you grow up in hell."

A family friend, P.G., who had known defendant all his life, testified: "[Defendant], to me, has always been a great kid. This was the kid that went to Disneyland with me, that's spent days at my house, that we – any milestone in his life, I was a part of. So it was just hard for me to even imagine that he could be a participant in something so awful." P.G. said it "was just a tragedy on both parts," and she "just [couldn't] comprehend what went on and what went wrong," but defendant "was a wonderful, wonderful person. I've never seen anything but good in him. This was a kid that is so bright that he participated in a program at USC for a couple of summers. He's just a bright kid. He's just lovable."

Defendant's brother also testified, saying he knew his brother was "not a baby killer." He described defendant as "a good, humble person. He's very respectable. . . . [H]e's always doing something good in school. If he's not . . . getting straight A's, he's writing poetry or something. [¶] He tried to better himself as a person. He's not a monster, he's just a little boy." Defendant's mother and cousin also testified to their belief that defendant did not do the crime. The cousin also mentioned defendant's daughter and that defendant loved his daughter and would not be able to see her any more.

After the prosecutor argued for "the maximum as required, which is 90 years to life," defense counsel spoke, observing that the Legislature had determined that his "position on this is very, very limited," so he would focus on his belief that defendant was innocent. He then pointed out that defendant was "a mere 15 years old" when arrested, with no history of violence; and a successful student who showed promise. He told the court that in defendant's neighborhood, "you have an adult male unemployment rate of approaching 90 percent," and "a gang presence that permeates the entire being." "You're in an area where kids are only engaging in anti-social activity." Counsel pointed out that defendant had not been kicked out of school or labeled a bully, but was going to

32

school and unfortunately began associating with gang members.  Counsel concluded by arguing defendant was not the perpetrator.

The court then spoke:  "[J]ustice is going to prevail today, because this case was absolutely overwhelming as to the cowardly act that [defendant] committed.  [¶]  And I know that he doesn't have any intestinal fortitude to look at me and sit up.  It's about time that [defendant] be the man that he pretends to be.  And he may be small in stature and young in age, but he is going to be treated like a man."

After noting that defendant committed a heinous crime and also hurt his own family, the court continued:  "And you have given your life away.  Because I don't expect that you will ever see any one of your relatives, your child, your mother, except behind bars and behind a glass partition.  And that is appropriate."

The court observed the victim's family would never be able to forget, and that "as a society, and as a system we have failed.  When it gets to the courthouse steps, we have already failed.  What we can do is assess the damage, meet out whatever justice we can, and in this case that's making sure that you never have the opportunity to kill another innocent victim.  [¶]  You have a hatred in your heart that is something that I cannot understand, and that has come through very clearly.  And you have people here who actually love you.  [P.G.], I could not speak any more eloquently as she has already done.  [¶]  This is a tragedy for everyone involved.  But why did you do this?  You're fighting an imaginary war.  These are not your enemies.  You killed a child.  And you didn't shoot that child one time, you shot him twice.  And why?  Because of the color of his skin.  Because of the color of the shirt that his parents were wearing.  [¶]  . . .  And you are not capable of showing remorse today, maybe not tomorrow, but I hope someday you are able to."

The court concluded:  "I've heard from your teacher, who speaks very highly of you.  I've heard from [P.G.], who speaks very highly of you.  And it is my hope that she is right, that you can be redeemed.  From what I have seen, I'm not willing to bet on it.  [¶]  But you are going to have the rest of your life to think about it. . . .  And I hope that at some point in time this hatred goes away, and that you can find in your heart to accept

people of another race, and to show some amount of remorse to this family for which you have just ruined their lives."

The court then imposed the sentence of 90 years to life, observing at one point that "you are going to be doing, perhaps, and I would expect the rest of your life, the rest of your natural life behind bars."

### c.     Conclusion

We begin by noting that defendant's counsel raised no Eighth Amendment claim in his initial opening brief. Because of that omission, and because the brief otherwise did not comply with minimum standards of professional competence and the California Rules of Court, we ordered the opening brief stricken from the record and directed the filing of a new opening brief. We accepted that brief as adequate for our review of the appeal.

In defendant's new opening brief, counsel contends the trial court departed from the *Roper-Graham-Miller* line of cases, and did not explain its reasoning for the harsh sentencing. Counsel argues the "inexplicable nature" of defendant's crime "points to the irrational and impulsive mind set of this juvenile offender, and the impact his environment and family life had in creating aggressive behavior." Counsel says the "sudden and uncharacteristic act of extreme violence that resulted in the death of a child . . . is impossible to explain," and that defendant's "immaturity, his impulsiveness, and irrational conduct all point to severe undiagnosed and untreated difficulties."

The unfortunate fact is that, with the exception of the testimony from his teacher suggesting the possibility of rehabilitation, there was no evidence or information in the record before the trial court on the factors identified in *Miller*. Defense counsel filed no sentencing memorandum; expressed his view that under the law his "position on this [was] very, very limited"; and focused on his belief that defendant was innocent – a belief belied by the evidence adduced at trial. Counsel merely argued that defendant was only 15, a successful student, and lived in a neighborhood with a high adult male unemployment rate that was permeated by gang presence.

The record of defendant's sentencing shows that the trial court did not consider the factors specified in *Miller*, proceeding instead (as did defense counsel) as though the

34

usual sentencing rules applicable to adult felons applied. The only *Miller* factor the court acknowledged was defendant's age, when the court stated that defendant was "young in age, but he is going to be treated like a man."

As we have seen, *Miller* expressly requires a sentencing court "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra*, 132 S.Ct. at p. 2469.) The complete absence of any mention of any of the factors identified in *Miller* and reiterated in subsequent cases requires us to return this case to the trial court for a new sentencing hearing.

We emphasize that we do not hold a trial court must expressly mention *Miller* or any other controlling authority. But the sentencing record must show that the trial court has considered the factors delineated in *Miller* before imposing a sentence on a juvenile offender that is the functional equivalent of life without the possibility of parole. Because the record here does not reflect the trial court's consideration of those factors, we remand the matter for a new sentencing hearing, at which defense counsel may present evidence and the trial court must take into account all relevant *Miller* factors. (*Miller, supra*, 132 S.Ct. at pp. 2468, 2471; see *id.* at p. 2466 ["imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children"].)[3]

## DISPOSITION

We reverse the sentence, remand for a new sentencing hearing, and affirm the judgment in all other respects.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.                    RUBIN, J.

---

**3** We express no opinion on how this issue should be resolved; we hold only that such a hearing must take place.